**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Case No. 1:21-cr-00141-RDM** |
| **v.** | **:** | |
| | **:** | |
| **MICHAEL SHANE DAUGHTRY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Michael Shane Daughtry ("Daughtry") to four months of home detention, 36 months of probation, 60 hours of community service, $500 restitution, and a mental health evaluation and, if necessary, mental health treatment.

**I.     Introduction**

The defendant, Michael Shane Daughtry, a federally licensed firearms dealer and former peace officer in Georgia, participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 10, 2022, Daughtry pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.  As explained herein, a 3-year probation sentence with four months home detention and a mental health condition is appropriate in this case because (1) the defendant entered and remained in the restricted area of the West Plaza, climbing onto southeast scaffolding; (2) as a former police officer, the defendant was aware of the dangers that his and other rioters' presence posed to law enforcement and members of Congress that day; (3) the defendant bragged to others that he was among the first to tear down fencing to begin the siege of the Capitol; (4) the defendant had concerning emails advertising the sale of "anti-liberal" bullets and AR-15s on social media in preparation of the 2020 presidential election; and (5) Daughtry is a 60 year old widower who has complied with all conditions of pretrial release, including home detention and relinquishment of firearms and other firearm-related business inventory pending prosecution of this case.

Even if he did not enter the Capitol or engage in violence during the riot, Daughtry's presence encouraged and celebrated the violence of the day.  The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here the defendant's participation in a riot that actually succeeded in halting the Congressional certification and his social media posts make a home detention, a mental health evaluation and requested probation both necessary and appropriate in this case.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 40 (statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the conduct in the West Front area of the Capitol where the defendant remained for over an hour on January 6.

### *Conduct in the West Front of the Capitol Grounds*

Assaults against police officers on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021 possible.[2]   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

---

[2] Daughtry is not charged with or known to have participated in assaultive conduct on January 6, 2021.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach

of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Image 1.  They flooded the area labeled "Lower West Plaza," Area C on Government's Image 1, pushing against the barricade there.



*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing

number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest

and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control chemical agents and flash-bang grenades, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them, as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

***Michael Shane Daughtry's Role in the January 6, 2021 Attack on the Capitol***

On January 4, 2021, Daughtry attended a Trump rally in Georgia and made the following Facebook post, "About 25,000 people at the Trump Rally tonight, now we're headed to Washington DC where they're expecting 4 Million people. Looks like we may have to walk about 5 miles to get there from what we were told at the rally but it'll be worth it to be able to yell crap at Pelosi and the rest of the idiots that left wing retards voted into office." *See* Image 5; ECF 40 ¶ 9; and PSR ¶ 16.



*Image 5: Daughtry's post on January 4, 2021*

On or about January 6, 2021, Daughtry traveled with his girlfriend from Georgia to Washington, D.C. to protest Congress' certification of the Electoral College vote of the 2020 Presidential Election. *See* ECF 40 ¶ 8; PSR ¶ 15.

On January 6, 2021, the defendant posted the below image of how close he got to the Capitol before the initial breach.  *See* Image 6.  The below image shows police officers and area-closed fencing around the Capitol restricting access to the area.   *See Id.* and also ECF 40 ¶ 10; PSR ¶ 17.



*Image 6: Daughtry's post of fencing*

After posting this image of the fencing, Daughtry also bragged: "We just tore down the fence and stormed the Capitol."  *See* ECF 40 ¶ 11; PSR ¶ 18, and Image 7.



*Image 7: Daughtry's "tore down" fencing post*

Also on January 6, 2021, the defendant spoke with an officer from the Pelham (Georgia) Police Department, where Daughtry previously worked, who recorded the conversation.  In this communication the defendant stated he was at the Capitol and was among those "that tore the fence down up there.  We was the first ones over the fence.  Everyone followed us."  PSR ¶ 18.  The defendant was among the first rioters to enter the restricted West Plaza area.  Daughtry claims to have remained in the restricted area until asked to leave by the President and the below image shows how close he came to the Capitol.  *See* Images 8 and 13, and ECF 40 ¶ 11, PSR ¶ 18 .



*Image 8: Daughtry seen in West Plaza on January 6th.*

From this vantage point, the defendant should have heard the dispersal order broadcasting to the crowd on a continuous loop beginning at 2:03 p.m.  Despite this warning and officers' deployment of riot control chemical agents and flash-bag grenades, the defendant remained in the area.

While in the West Plaza restricted area, the defendant climbed the southwest scaffolding, where he remained from approximately 2:40 p.m. to 3:40 p.m., as documented by his post labeled, "Our view from the scaffolding above the steps on the rear of the Capitol Building."  *See* Image 9.



*Image 9: Daughtry's post from scaffolding*

During this time, the defendant saw rioters confronting and assaulting law enforcement officers attempting to limit access to the Capitol. *See* ECF 40 ¶ 12; PSR ¶ 19.  According to Defendant's own posting he remained within the restricted area for several hours, where he "stood [his] ground until President Trump nicely asked us to leave."  *See* Image 13 on pg. 16.

*Defendant's Statements*

Daughtry was a former police officer with the Pelham (Georgia) Police Department who had been terminated in part because of his armory business, Crazy Coon Armory (see PSR ¶ 60) and because of (according to a Pelham Police employee) concerning Facebook posts about his armory business.  One such concerning post with Daughtry's Crazy Koon Armory logo was the night before the 2020 Presidential Election that asked, "Anyone needing an AR15 and some extra ammo before the election, I've got a couple left in stock...It may be your last chance if the election don't go right tomorrow! Let me know if you're interested."  *See* PSR ¶ 16, ECF 40 ¶ 7, and Image 10.



*Image 10 Daughtry's Facebook post from November 2, 2020.*

On December 26, 2020, Daughtry posted a picture of a woman alongside an undetermined number of rounds of ammunition which were partially coated in purple.  In the background of the picture, a machine used in the re-loading of ammunition can be partially seen.  The post reads, "I love a woman in a housecoat reloading ammo.  Ain't our Purple Anti-Liberal Bullets pretty.  We

13

finished up the first 500 rounds tonight...500 more to go.  My buddy 'Machine Gun Mikey' poured these powder-coated bullets for me. *See* Image 11.



*Image 11: Daughtry's "Anti-Liberal" bullets post*

Daughtry had other concerning posts about ammo, guns, and politics including a December 18th post where he claims, "When they finally start putting these Democrats in front of the firing squad for treason I hope they'll let me serve on the firing squad...I'll even bring my own ammo."



*Image 12: Daughtry's firing squad post*

Between January 4th and 7th, 2021, Daughtry made several posts.  See Images 5, 7, 8, and 9.  A Pelham Police Department officer who had seen Daughtry's Facebook posts, called Daughtry on January 6th at approximately 4:24 p.m. and recorded their communication.  In this conversation, Daughtry stated that he was at the Capitol that day and that he was one of the first people to force his way past the barricades surrounding the perimeter.  He acknowledged during the call that he went "up to the Capitol door" but "had to back off" when law enforcement officers shot him with rubber bullets.  Daughtry claimed, "We the one that tore the fence down up there." He also claimed "We was the first ones over the fence.  Everyone followed us."

On January 7, 2021, Daughtry posted pictures of a large crowd from his vantage point in the restricted area of the West Plaza on January 6th with the description.  See Image 9.  On that same day, Daughtry used Facebook to admit he "refused to leave the Capital [sic] steps for several hours" and also to spread false information that the attack was "stagged [sic] by the Capitol Police to make us look bad.  I never saw one patriot cause any damage or cause any trouble...The violence was all ANTIFA." *See* Image 13.



*Image 13: Daughtry's post describing January 6th events*

### The Charges and Plea Agreement

On January 12, 2021, Daughtry was charged by complaint with violating 18 U.S.C. §§ 1752(a). On January 15, 2021, he self-surrendered to FBI in Macon, Georgia. On February 19, 2021, Daughtry was charged by a three-count Information with violating 18 U.S.C. §§ 1752(a)(1), (2), and (3). On March 10, 2022, he pleaded guilty to Count One of the Information, charging him with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. By plea agreement, Daughtry agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Daughtry's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 25-31.

The U.S. Probation Office calculated Daughtry's criminal history as a category I, which is not disputed. PSR at ¶ 34. Combined with Daughtry's total adjusted offense level of 4, this yields

a Guidelines imprisonment range of 0-6 months. PSR at ¶ 71. Daughtry's plea agreement contains

an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S.

at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in

the interests of greater rationality, avoiding inconsistency, complying with congressional

instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C.

§ 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations

on empirical data and national experience, guided by professional staff with appropriate

expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*,

552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at

101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subject to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the requested sentence.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

  While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol or its restricted area on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol or its restricted grounds, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

  Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the restricted area or the Capitol building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

  To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor

cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Daughtry knowingly and intentionally entered and remained in a restricted area during a violent attack of the U.S. Capitol.  His presence helped ensure the delay of the certification of the 2020 Electoral College vote count and threatened the peaceful transfer of power after the 2020 Presidential election. While Daughtry remained in the restricted area of the Capitol, law enforcement officers were assaulted, many in the West Plaza area where Daughtry "stood [his] ground."  The assault of officers is especially important in this case because Daughtry is himself a trained peace officer who undoubtedly knew the danger his presence in a riotous crowd caused to officers and others.   Daughtry was also keenly aware of and decidedly ignored police tactics to disperse the crowd, including the use of flash-bags, rubber bullets, and a continuous broadcast of a dispersal order.   Despite Daughtry's specialized training and skill, he "tore down fencing" and remained in the restricted area for several hours, standing his ground.

Additionally, Daughtry's statements show a disconnect from reality and raise questions about his fitness to remain federally licensed as a firearms dealer.  Daughtry's criminal conduct has its inception in unfounded beliefs which he not only endorsed but capitalized on in his sale of weapons. As a federally licensed firearms dealer, Daughtry's desire to participate in a firing squad and his advertising the sale of "anti-liberal" bullets are an endorsement of violence against those whose political views differ from his own.  These messages,  along with the defendant's decision to enter and remain in a restricted area during a violent attack warrant a mental health evaluation and, if necessary, mental health treatment and possibly relinquishment of his federal firearms dealer license.  See also PSR ¶¶ 49-51.

Accordingly, the nature and the circumstances of this offense establish the clear need for the requested sentence in this matter.

### B.   The History and Characteristics of the Defendant

Daughtry is a former police officer, having been employed by the Pelham Police Department or Camilla Police Department from 2002 to 2020.  PSR ¶ 59.  He is 60 years old and has no prior criminal history.  PSR ¶ 34.  The defendant has an active federal firearms license with an expiration date of March 1, 2023.  PSR ¶ 60.  The misdemeanor conviction for which the defendant is awaiting sentencing will not affect this license.  Defendant was self-employed running an armory business, Crazy Koon Armory, until he relinquished his inventory as a condition of pretrial release, and his business has been temporarily closed.  *Id.*  The defendant has complied with pretrial conditions including home detention since January 15, 2021.

The defendant claims to not suffer from any mental or emotional health problems.  PSR ¶ 49.  Daughtry's father was diagnosed with bi-polar disorder at age 60 and ultimately took his own life in 2004.  PSR ¶ 50.  Daughtry's mother is concerned with the defendant's mental health and believes he may be suicidal but says he has not articulated a plan.  PSR ¶ 51.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a custody sentence. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Mariposa Castro,* 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.")(statement of Judge Walton at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (Statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Daughtry's statements and his actions on January 6th clearly demonstrate the need for specific deterrence; however, the government believes that end can be achieved with a sentence of four months home detention and a condition of supervision that Daughtry undergo a mental health evaluation.  On January 6th, Daughtry remained for some time in the violent and restricted area of the Capitol's West Plaza; however, Daughtry is not known to commit acts violence or obstruction. Daughtry did not enter the Capitol; he did not steal or destroy property.  Since his arrest in January 2021, Daughtry has been compliant with conditions of pretrial release including home detention, location monitoring, and relinquishment of his firearms and other inventory from his armory business.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I

---

[4]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much

smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence imposed on Brandon Straka (21-cr-579-DLF) for reference. In *Straka*, like the instant case, the defendant did not enter the U.S. Capitol although he did encourage and cheer on rioters and make extensive social media posts about the January 6th events. At sentencing the government recommended four months home detention, 36 months' probation, 60 hours community service and $500 restitution. The Court

sentenced Straka to three months home detention, 36 months' probation, a $5,000 fine, 60 hours community service and $500 in restitution.

The Court may also consider the sentence imposed on Jeffery Witcher (21-cr-235-RC). Witcher, like Daughtry, traveled from out of state in order to attend the "Stop the Steal" rally and walked to the Capitol, but neither destroyed property nor took part in violence. Unlike Daughtry, Witcher entered the Capitol itself. On October 20, 2021, Witcher entered a guilty plea to one count of 18 U.S.C. §1752(a)(1) and the government requested a sentence of two month's home detention, 36 months' probation, 60 hours of community service, and $500 restitution. Witcher, who cooperated with law enforcement from the beginning of the investigation, was ultimately sentenced to 12 months' probation, 60 hours of community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

sentence. Balancing these factors, the government recommends that this Court sentence Michael

Shane Daughtry to 4 months' home confinement, 36 months' probation, 60 hours of community

service, $500 restitution, and a mental health evaluation and, if recommended, mental health

treatment. Such a sentence protects the community, promotes respect for the law, and deters future

crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing

his early acceptance of responsibility.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

</div>

BY:      */s/Gracie Lindberg*
              Graciela R. Lindberg
              TX Bar No. 00797963
              Assistant United States Attorney
              11204 McPherson Road, Suite 100A
              Laredo, Texas 28045
              Office: 956-721-4960
              graciela.lindberg@usdoj.gov